[No. G005168. Fourth Dist., Div. Three. Mar. 9, 1989.]

KAY BRENNEMAN et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA, Defendant and Respondent.

---

*Pursuant to California Constitution, article VI, section 21.

**COUNSEL**

Sayre, Moreno, Purcell & Boucher, Raymond P. Boucher, Richard L. Akel and Bonnie Lane for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Marvin Goldsmith, Assistant Attorney General, Randall B. Christison and Kristin G. Hogue, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**SCOVILLE, P. J.**—On August 25, 1981, Robert J. Thompson, a convicted child molester out on parole, molested and murdered 12-year-old Benjamin Brenneman. Benjamin's parents and sisters (Brennemans) sued the State of California and others; their theory against the state was negligent failure to control Thompson or to warn Benjamin of Thompson's proclivities. Brennemans appeal dismissal as to the state, after a demurrer to their second amended complaint was sustained without leave to amend.

### ALLEGED FACTS[1]

Prior to Benjamin's murder, Thompson had been convicted of numerous sexual crimes against minors, one of these committed at knifepoint. After serving three years for the most recent of these offenses, he was paroled on May 6, 1981. As of that date, postrelease parole procedures for felons were outlined in the California Department of Corrections Parole Procedures Manual-Felon (Manual). Brennemans assert this manual was adopted pursuant to Penal Code section 5058, but the second amended complaint does not so allege. The Manual mandated an initial reassessment of the parolee's "risks and needs" between 75 and 105 days from the date of release. As of August 25, 1981, 111 days after Thompson's release on parole, no such reassessment had taken place. (The second amended complaint does not allege in so many words that the reassessment never took place. Rather, it alleges the state "failed to exercise reasonable diligence to discharge its reassessment duties." We construe this allegation liberally (*Glaire* v. *La Lanne-Paris Health Spa, Inc.* (1974) 12 Cal.3d 915, 918 [117 Cal.Rptr. 541, 528 P.2d 357]) as a statement that the state failed to perform the required reassessment prior to the murder.)

Benjamin was a paperboy in Thompson's neighborhood. On August 25, Thompson kidnapped Benjamin, molested him and murdered him.

Brennemans' original complaint asserted causes of action against the state for negligent computation of eligibility for parole, negligent postrelease

---

[1] Unless otherwise noted, the allegations summarized are taken from Brennemans' second amended complaint.

supervision, violation of mandatory duties under several specified statutes, and violation of Brennemans' civil rights. The state demurred on the grounds that: the state had no duty to control Thompson; Government Code section 845.8 immunized state decisions concerning parole release and supervision; and the statutes alleged to impose mandatory duties had no relation to the alleged facts. According to the parties, this demurrer was sustained with leave to amend.

Brennemans filed a first amended complaint and, shortly thereafter, a second amended complaint. The second amended complaint dropped the assertions of negligent computation, violation of civil rights and violation of the various statutes. It alleged negligent failure to supervise Thompson (failure to warn was cited in introductory language), and described the supervisory failures as violating mandatory duties imposed by the Penal Code generally and by the Manual.

The state demurred, asserting again the absence of any duty to control Thompson or issue warnings concerning him, and the applicability of Government Code section 845.8; the state also disputed the existence of any mandatory duty under Government Code section 815.6. This demurrer was sustained without leave to amend. Brennemans appealed the resulting judgment in favor of the state.

In their brief on appeal, Brennemans assert Thompson was supposed to be subject to a particularly strict form of supervision known as "controls emphasis" supervision (Manual, § 513(a)). The second amended complaint does not so allege. Similarly, Brennemans assert, with no matching allegation, that Thompson showed signs of "anger, aggression, tension and sexual perversion" immediately prior to the murder.

DISCUSSION

### I. *Plaintiffs Have Not Successfully Alleged a Mandatory Duty.*

■■■■ Government Code section 815.6 provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."[2] "Enactment" as used in this

---

[2] Government Code section 815.6 "applies to public entities the familiar rule of tort law that violation of a legislatively prescribed standard of care creates a rebuttable presumption of negligence." (*Lehto* v. *City of Oxnard* (1985) 171 Cal.App.3d 285, 292 [217 Cal.Rptr. 450].) This rule is codified in Evidence Code section 669, subdivision (a). Discussions of

statute means "a constitutional provision, statute, charter provision, ordinance or regulation." (Gov. Code, § 810.6.) The applicable definition of "regulation" is "a rule, regulation, order or standard, having the force of law, adopted by an employee or agency of the United States or of a public entity pursuant to authority vested by constitution, statute, charter or ordinance in such employee or agency to implement, interpret, or make specific the law enforced or administered by the employee or agency." (Former Gov. Code, § 811.6 [current § 811.6 applies only to actions based on acts or omissions occurring on or after Jan. 1, 1988].) The definitions of "enactment" and "regulation" were intended to refer to "measures of a formal legislative or quasi-legislative nature." (Cal. Law Revision Com. com., 32 West's Ann. Gov. Code, § 810.6 (1980 ed.) p. 158.)

■ A plaintiff asserting liability under Government Code section 815.6 "must specifically allege the applicable statute or regulation." (*Lehto* v. *City of Oxnard, supra,* 171 Cal.App.3d 285, 292.) References in the second amended complaint to "mandatory ministerial duties . . . mandated by the Penal Code" clearly fail this test. Nor do we regard the general references to mandatory duties created by the Manual as sufficient. The only supposed enactment specifically alleged is the requirement of a "formal reassessment of the risks and needs of [the] parolee during the period between seventy-five (75) to one hundred five (105) days from the date of . . . release."
■ Nevertheless, given the suggestion in the record that the trial court may have taken judicial notice of other sections of the Manual (see *Highlanders, Inc.* v. *Olsan* (1978) 77 Cal.App.3d 690, 697 [143 Cal.Rptr. 679])— and given our need to determine whether the court below properly sustained the state's demurrer without leave to amend—we will examine other portions of the Manual included in the record for mandatory duties pertaining to the facts alleged.

The last decade has seen active disagreement among the courts, and between the courts and the Legislature, concerning whether internal policy manuals of public entities constitute "enactments" under Government Code 815.6 (or "regulations" under Evidence Code section 669, subdivision (a)). We need not venture into this thicket. Even if we assume provisions of the Manual constitute an enactment under Government Code section 815.6, we hold the Manual imposes no mandatory duties on the state, breach of which proximately caused Brennemans' tragic loss.

Brennemans contend the Manual mandated formal reassessment of Thompson's "risks and needs" between 75 and 105 days after his release.

whether a mandatory duty exists under Government Code section 815.6 and whether a standard of care has been legislatively prescribed under Evidence Code section 669 are therefore interchangeable.

This contention is accurate but insufficient. The reassessment process does not automatically trigger any specific requirement of administrative action, let alone action that would have prevented Thompson's attack on Benjamin. The state's decision as to how data gained in the reassessment should affect supervision of the parolee is clearly discretionary. Any connection between the delay in reassessing Thompson and Thompson's conduct on August 25, 1981, is incurably speculative. The duty to conduct a reassessment is essentially a duty to investigate. ■ A "mandatory statutory duty to 'investigate' . . . may not reasonably be read as imposing a mandatory duty . . . to *take action* . . . ." (*State of California* v. *Superior Court* (1984) 150 Cal.App.3d 848, 858 [197 Cal.Rptr. 914], italics in original.) Moreover, breach of a duty to investigate is not a proximate cause of injuries flowing from the failure to prevent certain conduct by the object of investigation. (*Id.* at pp. 856-859.)

■ The remainder of the supervisory scheme set forth in the Manual (or at least, in those sections of the Manual included in the record) provides no hook on which Brennemans could hang a claim under Government Code section 815.6. Section 511, subdivision (f) of the Manual states that a parolee's agent of record "will" be responsible for the delivery of all "services and controls" contained in the parolee's action plan. The action plan is developed individually for each parolee, based on data gained in assessments and reassessments of the parolee's progress (see Manual § 512, subd. (c)). A supervision agenda prepared for a particular parolee, and constantly adjusted in light of developments, is not an "enactment" under Government Code sections 810.6 and 815.6. As for the "controls emphasis" category of supervision, in which Brennemans now contend the state had placed Thompson: it authorizes programs "includ[ing], but . . . *not limited to,* closer observation, investigation, substance abuse detection, and intervention." (Manual § 513, subd. (a), italics added.) Such language clearly grants the Department of Corrections considerable discretion in deciding how to supervise and when to control a parolee. It imposes no mandatory duty to choose one course over another.

## II. *No General Tort Duty to Control or Warn.*

■ Under Government Code sections 815.2 and 820, the state may be held liable for the acts and omissions of Thompson's parole officers, unless immunized by statute, wherever a private individual or entity would be liable under similar circumstances. ■ We therefore consider whether Brennemans have alleged, or could allege, that state had a duty, under general tort law, to supervise or otherwise control Thompson, or to warn Benjamin or Brennemans of the danger Thompson posed. We must answer in the negative.

The issues of duty to control and duty to warn are generally treated as parallel. (See, e.g., *Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 751 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]; *Hooks v. Southern Cal. Permanente Medical Group* (1980) 107 Cal.App.3d 435, 443 [165 Cal.Rptr. 741].) *Thompson, supra,* cogently explains why we may not find a duty to control or warn in this case. *Thompson* upheld an order sustaining a demurrer without leave to amend on the following facts. J., a juvenile, had been in county custody. He had " 'latent, extremely dangerous and violent propensities regarding young children . . . .' " (*Id.* at p. 746.) While in custody, he threatened that, if released, he would kill some young child living in the neighborhood. No particular child was specified. The county released J. to his mother's custody on temporary leave, without warning the police or local residents. Within 24 hours J. murdered the plaintiff's son in J.'s mother's garage.

Our Supreme Court held the county had no duty to warn the police or the mothers of neighborhood children concerning J.'s release or propensities. Noting the general rule that one owes no duty to control the conduct of another, the court found no applicable exceptions to that rule. The court went on to explain the public policies underlying its decision: "By their very nature parole . . . decisions are inherently imprecise. . . . [A] large number of parole violations occur. . . . Although . . . not all violations involve new or violent offenses, a significant proportion do. [¶] Notwithstanding the danger illustrated by the foregoing statistics, parole and probation release nonetheless comprise an integral and continuing part in our correctional system . . . , serving the public by rehabilitating substantial numbers of offenders and returning them to a productive position in society. The result, as we observed in *Johnson,* is that 'each member of the general public who chances to come into contact with a parolee bear[s] the risk that the rehabilitative effort will fail. . . .' (69 Cal.2d at p. 799.) . . . [¶] Bearing in mind the ever present danger of parole violations, we nonetheless conclude that public entities and employees have no affirmative duty to warn of the release of an inmate with a violent history who has made *nonspecific threats of harm directed at nonspecific victims.* Obviously aware of the risk of failure of probation and parole programs the Legislature has nonetheless as a matter of public policy elected to continue those programs even though such risks must be borne by the public. [Citation.]" (*Thompson v. County of Alameda, supra,* 27 Cal.3d at pp. 753-754.)

*Beauchene v. Synanon Foundation, Inc.* (1979) 88 Cal.App.3d 342, 347-348 [151 Cal.Rptr. 796], cited with approval in *Thompson* (27 Cal.3d at p. 754), relied upon the same public policy considerations to hold that a rehabilitation agency, whether public or private, has no duty to control a convict participating in its rehabilitation program. *Cardenas* v. *Eggleston*

*Youth Center* (1987) 193 Cal.App.3d 331, 334-335 [238 Cal.Rptr. 251] reached the same conclusion.

Brennemans cite *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352] and *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166] as support for their contention the state's special relationship to Thompson imposed on the state a duty to control Thompson's conduct. This argument was rejected in *Thompson,* which distinguished these cases and confined the special relationship exception to situations involving a direct or continuing relationship between the state and the *plaintiff* (or plaintiff's decedent), or "a prior threat to a specific identifiable victim." (*Thompson* v. *County of Alameda, supra,* 27 Cal.3d 741, 753, 758; see also *State of California* v. *Superior Court* (1974) 37 Cal.App.3d 1023, 1027 [112 Cal.Rptr. 706].) As noted above, the juvenile perpetrator's threat, in *Thompson,* to kill a young child residing in the neighborhood did not suffice to render the victim "specific" and "identifiable." Brennemans' allegations that Benjamin was a paperboy residing in and serving Thompson's neighborhood are not substantially distinguishable from the allegations *Thompson* held insufficient.

### III. *Supervision of Parolee Falls Within Government Code Section 845.8, Subdivision (a) Immunity.*

■ Even if Brennemans were able to allege the state had duty to supervise Thompson and that violation of that duty proximately caused their injuries, their cause of action would be precluded by the immunity provided in Government Code section 845.8, subdivision (a). That section states "Neither a public entity nor a public employee is liable for . . . [a]ny injury resulting from determining whether to parole or release a prisoner or from determining the terms and conditions of his parole or release or from determining whether to revoke his parole or release."

The statute "is a specific application of the discretionary immunity recognized in California cases and in [Government Code] Section 820.2." (Cal. Law Revision Com. com., 32 West's Ann. Gov. Code, § 845.8 (1980 ed.) p. 416.) In applying the statute, however, the courts have recognized that "[m]inisterial implementation of correctional programs . . . can hardly, in any consideration of the imposition of tort liability, be isolated from discretionary judgments made in adopting such programs." (*County of Sacramento* v. *Superior Court* (1972) 8 Cal.3d 479, 485 [105 Cal.Rptr. 374, 503 P.2d 1382]; *State of California* v. *Superior Court, supra,* 37 Cal.App.3d 1023, 1027.) Several cases have accordingly held, without detailed inquiry into the level of discretion involved, that Government Code section 845.8, subdivi-

sion (a) bars any state liability for negligent supervision of a released prisoner. (*Duffy* v. *City of Oceanside* (1986) 179 Cal.App.3d 666, 672-673 [224 Cal.Rptr. 879] [failure to properly supervise parolee]; *Martinez* v. *State of California* (1978) 85 Cal.App.3d 430, 435-436 [149 Cal.Rptr. 519], affd. 444 U.S. 277 [62 L.Ed.2d 481, 100 S.Ct. 553] [failure to supervise parolee]; *Whitcombe* v. *County of Yolo* (1977) 73 Cal.App.3d 698, 714-717 [141 Cal.Rptr. 189] [failure to investigate alleged probation violations and report actual violations to court].) A fortiori, the Manual's extensive grant of supervision discretion places this case squarely under Government Code section 845.8, subdivision (a).

■ Brennemans have not shown a reasonable possibility they could further amend their complaint to state a cause of action. It was thus proper to sustain the state's demurrer without leave to amend. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 118, 703 P.2d 58].)

The judgment is affirmed.

Crosby, J., and Wallin, J., concurred.

The petition of appellant Kay Brenneman for review by the Supreme Court was denied May 23, 1989.